UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARLINE YOUNG, et al.,

       Plaintiffs,

v.

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA (UAW), LOCAL 651, et al.,

       Defendants.

_____/

Case No. 15-11151

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING UAW DEFENDANTS' MOTION TO DISMISS [16]
AND DENYING PLAINTIFFS' REQUESTS TO AMEND COMPLAINT**

Plaintiffs' Complaint asserts a classic hybrid section 301 claim, alleging that the defendant employer violated Plaintiffs' rights under several collective bargaining agreements, associated supplemental agreements and memorandums of understanding, and that the defendant unions breached their duty of fair representation. This matter is before the Court on two of the defendant unions' motion to dismiss. The court held a hearing on this matter. For the reasons stated below, the Court grants their motion to dismiss (docket no. 16.).

**I.    FACTS**

Plaintiffs are 93 former employees of Delphi Corporation, who are currently employees of Defendant General Motors, LLC ("GM") and who work at the following plants within the Eastern District of Michigan: Flint Assembly, Davison Road CCA, Lansing Grand River, Flint Engine South, Flint Stamping or Lansing Delta. (Pls.' Compl. ¶ 4.) Plaintiffs

bring suit against three defendants: International Union United Automobile, Aerospace and Agricultural Implement Workers of America, Local 651 ("Local 651"), International Union United Automobile, Aerospace and Agricultural Implement Workers of America ("International," together "UAW Defendants") and General Motors, LLC ("GM"). (Pls.' Compl. ¶ 5.) Plaintiffs' claims are that Defendant GM violated collective bargaining agreements and related agreements because Plaintiffs remain at a lower Tier II wage level and they should be paid at the higher Tier I wage level at GM and that the UAW Defendants violated their duty of fair representation.

**A. Background**

The parties agree that in the early to mid-2000's, the automotive industry, including Delphi Corporation, was experiencing financial problems and heading into an economic downturn.[1] (Compl. ¶ 7; Defs.' Mot. 1.)  In 2004, the UAW and Delphi entered into a Supplemental Agreement ("2004 Supplemental Agreement) effective May 3, 2004. (Compl. ¶ 37; Defs.' Mot. 4, Ex. 1.) The terms of the 2004 Supplemental Agreement applied to "all hourly bargaining unit employees newly hired on or after the Effective Date at all Delphi facilities covered by the UAW-Delphi National Agreement, including temporary employees on the roll prior to the Effective Date who are subsequently converted to permanent

---

[1] By way of background, in 1999 GM spun-off a portion of its parts manufacturing operations to Delphi Corporation. (Compl. ¶¶ 5, 6; Defs.' Mot. 3.) As a result, GM employees at those operations became Delphi employees, including some of the Plaintiffs. (Compl. ¶ 6; Defs.' Mot. 3.) According to the UAW Defendants, Delphi assumed GM's obligations under its 1996 collective bargaining agreement with the UAW. That agreement expired in October 1999 and the UAW and Delphi entered into a new collective bargaining agreement, effective October 18, 1999. A successor agreement followed, effective October 6, 2003. (Compl. ¶ 37, Defs.' Mot. 3.)

2

status."[2] (Defs.' Mot. Ex. 1, Article 1; Compl. ¶ 14.) The 2004 Supplemental Agreement set up a second tier or lower wage rate for those incoming employees. (Compl. ¶ 14; 2004 Supp. Agr., Def's Mot. Ex. 1.) As Plaintiffs' attorney clarified at the hearing, the majority of Plaintiffs began working for Delphi in 2006. (Compl. ¶ 14.) They were paid at the lower Tier II levels pursuant to the 2004 Supplemental Agreement. (Compl. ¶ 14.) Some Plaintiffs had worked at GM prior to the Delphi spin-off in 1999. (Compl. ¶ 6.) Despite these cost-saving measures, Delphi filed for Chapter 11 bankruptcy in 2005. (Defs.' Mot. 5; *see also In re Delphi Corporation, et al*, Case No. 05-44481, 2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008).)

Plaintiffs allege that pursuant to a Memorandum of Understanding between Delphi and the International UAW, signed on November 21, 2006, all supplemental (temporary) employees in UAW-Delphi plants on or before November 20, 2006 would be converted to permanent employees and alleges that all Plaintiffs were considered permanent Delphi employees. (Compl. ¶ 8.) It remains unclear to what agreement this refers; neither party provided an agreement signed on this date.[3]

On June 22, 2007, after Delphi had filed for bankruptcy, the UAW, Delphi and GM signed the "UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring" or, as the parties refer to it, the "Restructuring Agreement" ("2007 RA"). This agreement figures

---

[2] Plaintiffs' Complaint does not refer to the 2004 Supplemental Agreement by name, yet Plaintiff conceded that "[t]hose plaintiffs who began working for Delphi in 2006 . . . had been paid at Tier II levels at Delphi . . . ." and referenced "various agreements." (Compl. ¶¶ 14, 38.)

[3] Plaintiffs do not include a 2006 agreement or other document in their recitation of agreements in the Complaint or their response. (Compl. ¶¶ 8, 12, 37; Pls.' Resp. 7.)

3

prominently in Plaintiffs' claims. (Compl. ¶ 9; Defs.' Mot. 1 Ex. 2.)  The 2007 RA provided that the "UAW-Delphi Supplemental Agreement dated April 29, 2004 . . . shall continue in full force and effect, as modified herein, for its stated duration, . . . ." (2007 RA, Part A.) The 2007 RA included provisions under which GM agreed to absorb employees at some Delphi plants, and it also included retirement, buy out and buy down provisions, discussed in further detail, below.

Plaintiffs allege that pursuant to the 2007 RA, 1000 employees were to be "transferred to GM as permanent employees, keeping their same wage rates, same seniority and same spot on the wage progression scale (which governed pay increases)." (Compl. ¶ 9.) Plaintiffs allege that this should have included all Plaintiffs. The 2007 RA also included a designation for what it called "Footprint Sites", and the Flint East site was one of these footprint sites. (Compl. ¶ 18.) The 2007 RA provided that Flint East employees would transfer to employment with a third party by December 31, 2008, and if not, GM and the UAW would "implement a solution such that these bargaining unit employees will no longer remain as Delphi employees." (Compl. ¶ 18; Defs.' Mot. Ex. 2 at 3-4.)

By March, 2008, only 230 employees were transferred to GM from Delphi. (Compl. ¶ 10.) On January 5, 2009, GM hired all Delphi employees, including Plaintiffs, pursuant to the 2007 RA. (Compl. ¶ 11; Defs.' Mot. 1-2, 7.) Those employees were paid at Tier II wage levels from 2009 to present. (Comp. ¶¶ 13, 14.)  Plaintiffs argue that with migration to GM they should have gained greater seniority and Tier I wages, in part because they had Delphi seniority that predated GM's introduction of its own two tier wage system in 2007. (Compl. ¶ 14.)

### B. Plaintiffs' Grievance Process

On December 13, 2010, Plaintiffs filed a group grievance with Local 651. (Compl. ¶¶ 16-22.) There is no dispute that Plaintiff Young filed the grievance on behalf of a group. Plaintiffs allege that on October 13, 2011, nearly one year later, Plaintiff Young wrote letters to Jeff Austin, Chairman of Local 651, and Mike DiCosola, Servicing Representative of UAW Region 1C (International), inquiring about the status of the grievance. (Compl. ¶ 23.) According to Plaintiff's Complaint:

> Plaintiff Young, who was a committee person for the Local at the time, said in her letter that she had been told on September 21, 2011 by local President Art Reyes that the grievance was "dead," but plaintiff Young stated in her letter that no one had ever informed her verbally or in writing that the grievance was no longer active. (Compl. ¶ 23.)

On October 19, 2011, Mr. Austin wrote a letter "in response" to Ms. Young's inquiry regarding "Grievance # 90104 that was issues (sic) on behalf by you [Ms. Young] on behalf of the hourly workers."[4]  (Compl. ¶ 24; Pls.' Response Ex. B to Young Aff. at Ex. A.) The letter states that "[m]anagement as you are well aware denied the grievance and they gave their formal decision to the union on 1-27-11." The letter laid out the path that the grievance took after management's denial, including that the grievance was not settled as of a June 1, 2011 meeting and was "placed on hold." It concluded that "[a]s to the current status of that grievance it has been relinquished to the Regional office and it is still in the possession of Mike DiCosola." (Pls.' Resp. Ex. B to Young Aff. Ex. A.)

---

[4] Plaintiffs submitted Plaintiff Young's Affidavit with attached documents. UAW Defendants correctly point out that to the extent that the affidavit contains matter outside the pleading, the Court should exclude it for purposes of the instant motion to dismiss. *See* Fed. R. Civ. P. 12(d); *Excel Homes, Inc. v. Locricchio*, 7 F. Supp. 3d 706, 710 (E.D. Mich. 2014) (Cox, J.).

5

Plaintiff Young wrote another letter of inquiry on December 1, 2011, to Mr. Austin, again inquiring as to the status of the grievance and "in light of the comment allegedly made by Austin to another union-member to the effect that the grievance was 'dead'." (Compl. ¶ 25.) Plaintiffs provide a copy of a letter by Plaintiff Young to Mike DiCosola, Servicing Representative, dated January 5, 2013, in which Plaintiff Young again inquires about the status of "Group Grievance #90104 re: the MOU Wage Agreement." (Compl. ¶ 26; Pls.' Resp. Ex. C to Young Aff. Ex. A.) Representative DiCosola responded by letter dated January 14, 2013 with the following:

> This letter is in response to your most recent letter dated January 5, 2013. As I stated during a verbal discussion with you in November of 2011, I notified management grievance no. 90104 was formerly withdrawn. After investigation, I found there was no violation of the 2007 National Agreement Modifications.

(Compl. ¶ 27; Pls.' Resp. Ex. D to Young Aff. Ex. A.)

On March 13, 2013, Plaintiffs Shante Marshall and Jakeiya Anderson filed an appeal of the union's decision to withdraw the grievance. (Compl. ¶ 28; Defs.' Mot. To Dismiss Ex. 7.) By letter dated June 17, 2013, the UAW acknowledged receipt of Plaintiffs Marshall and Anderson's March 13, 2013 request "to appeal the withdrawal of Group Grievance #90104 (seniority issue)." (Compl. ¶ 29; Pls.' Resp. Ex. E to Young Aff. Ex. A.) The Complaint alleges that "[t]o date, despite several plaintiffs having written and/or called the International and/or the PRB, the matter has not been resolved at the IEB level or sent to the PRB or set for any sort of hearing." (Compl. ¶ 33.) In their Complaint, Plaintiffs alleged that the grievance and/or appeal had been pending for more than four years. Actually, Plaintiffs filed their Complaint 10 days after the date of the appeal was denied, and Plaintiff's counsel states that he was not aware of International's March 16, 2015 denial of the appeal at the

time of filing the Complaint. (Dkt. no. 1; Pls.' Resp. 6.) UAW Defendants provide correspondence from the UAW to Plaintiffs Marshall and Anderson dated March 16, 2015, denying the appeal. (Defs.' Mot. To Dismiss Ex. 8.) The parties agree that International's March 16, 2015 letter denies the appeal.[5] (Pls.' Resp. 6.)

UAW Defendants argue that the claims against them should be dismissed for the following reasons: They are time-barred; the Complaint does not identify the actual terms of the collective bargaining agreement that were allegedly breached; and the Complaint does not allege an independent claim for breach of the duty of fair representation. The Court agrees.

## II. LEGAL STANDARD

The Sixth Circuit noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains

---

[5] Plaintiffs have twice asked to amend their Complaint, not by motion, but by a request in Plaintiffs' Response at p. 6, Dkt. # 18 and at the hearing. In their Response Plaintiffs sought to amend the Complaint to show the correct date of denial of the appeal. These parties agree on the appeal denial date. This single amendment to the Complaint does not make a difference to the outcome of this motion or the remaining Defendant GM's status, where the parties agree the appeal was denied and that denial is now part of both the record and this Court's Opinion and Order. (Pls.' Resp. 6.) At the hearing, Plaintiff's counsel again moved to amend the Complaint to make additional and specific allegations. Plaintiffs' counsel was asked to identify the specific contract provisions that were violated and he was unable to do so. As to other factual matter that Plaintiffs seek to add, for example, that 10 to 12 people had worked at GM at Tier I wages and prior to the bifurcated wage system set forth for Delphi under the 2004 Supplemental Agreement, Plaintiffs' Complaint already addresses such matters generally, and the Court considered them. (Compl. 6.) The Court denies the motion to amend as futile. *See* Fed. R. Civ. P. 15. It is worth noting that Plaintiffs have not complied with Local Rule 15.1 in seeking to amend their pleading; they have not provided a proposed amended pleading, yet, as set forth above, Plaintiffs were given the opportunity at the hearing to identify specific amendments they wish to make.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Assoc.,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, while the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Estate of Barney*, 714 F.3d at 925 (citing *Iqbal*, 556 U.S. at at 679; quoting Fed. R. Civ. P. 8(a)(2)).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Finally, the Court must keep in mind that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555 (citation omitted).

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed.R.Civ.P. 10(c)). "A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336.  "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335-36; *see also Greenberg v. Life Ins.*

8

*Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999)(documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim") (internal quotation marks and citations omitted); *Weiner v. Klais and Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (where the plaintiff referenced the "plan" numerous times in the complaint, the court could consider the plan documents along with the complaint; "they were incorporated through reference to the plaintiff's rights under the plans, and they are central to plaintiff's claims"). This is especially relevant here, where Plaintiffs provide no documents with their Complaint, yet reference a plethora of agreements and correspondence that are central to their claims.

## III. ANALYSIS

Plaintiffs bring a hybrid § 301 claim. A hybrid § 301 claim is "the consolidation of two separate but interdependent actions: one against the employer for breach of the collective-bargaining agreement and one against the union for breach of the duty of fair representation." *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1238-39 (6th Cir. 1993). "To prevail under any claim, the employee must show both that the employer discharged him in violation of the collective-bargaining agreement *and* that the union breached its duty of fair representation during the grievance process. Therefore, the two claims are often combined in a single lawsuit and referred to as a hybrid § 301/fair representation claim." *Id.* at 1239 (emphasis in original).

The Supreme Court looked to the National Labor Relations Act ("NLRA") to find an appropriate statute of limitations for hybrid § 301 claims and determined that it is the six-month statute of limitations in NLRA section 10(b). *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169 (1983); *see also Robinson*, 987 F.2d at 1238. "In general,

9

'[a] claim accrues . . . when the claimant discovers, or in the exercise of reasonable due diligence should have discovered, the acts constituting the alleged violation.'" *Robinson*, 987 F.2d at 1239 (citing *Adkins v. Int'l Union of Electrical, Radio & Mach. Workers*, 769 F.2d 330, 335 (6th Cir. 1985)). The Sixth Circuit has pointed out that "[s]eparate causes of actions in a hybrid § 301/fair representation claim accrue simultaneously, and that 'the timeliness of the suit must be measured from the date on which the employee knew or should have known of the union's final action or should have known of the employer's final action, whichever occurs later.'" *Id.* at 1239 (citing *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1560 (11th Cir. 1986)). This Circuit has agreed with the Third Circuit "that the employee's hybrid cause of action may arise when the union takes an unequivocal position that it will not seek arbitration." *McCreedy v. Local Union No. 971, UAW*, 809 F.2d 1232, 1236 (6th Cir. 1987). Before a party seeks relief in federal court and brings a section 301 claim, the employee "must exhaust any grievance or arbitration remedies provided in the collective-bargaining agreement." *Robinson*, 987 F.2d at 1239; *see also Wilson v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 83 F.3d 747, 752 (6th Cir. 1996).

### A.   Whether Plaintiffs' Claims Are Time-Barred

#### 1.   The Date On Which Plaintiffs' Cause of Action Accrued

Plaintiffs' group grievance was filed on December 13, 2010. (Compl. ¶ 16.) Plaintiffs admit in the Complaint that in an October 13, 2011 letter from Plaintiff Young to Jeffrey Austin, Chairman of Local 651, "Plaintiff Young, . . . said . . . that she had been told on September 21, 2011 by local president Art Reyes that the grievance was 'dead,' but plaintiff Young stated in her letter that no one had ever informed her verbally or in writing that the

10

grievance was no longer active." (Compl. ¶ 23.)

Despite the allegations in the Complaint that Plaintiff Young was informed as early as September 2011 that the grievance was "dead", factual inferences are drawn in the light most favorable to the non-moving party, and Plaintiffs were notified of the outcome of their grievance in writing by Mike DiCosola on January 14, 2013. (Compl. ¶ 27.) Mr. DiCosola's letter stated:

> Dear Sister Young:
>
> This letter is in response to your most recent letter dated January 5, 2013. As I stated during a verbal discussion with you in November of 2011, I notified management grievance no. 90104 was formerly withdrawn. After investigation, I found there was no violation of the 2007 National Agreement Modifications.

(DiCosola Letter Jan. 14, 2013, Defs.' Mot. Dismiss Ex. 6; Pls.' Resp. Aff. Ex. D.) The Court finds that January 14, 2013, was the date when the union notified Plaintiffs that the grievance was withdrawn and thereby took the unequivocal position that is will not seek arbitration. This is the date Plaintiffs hybrid § 301 cause of action arose. To file within six months of this date, Plaintiffs would have had to file an appeal on or by June 14, 2013. Two Plaintiffs filed a timely appeal on March 13, 2013, and Plaintiffs filed their complaint on March 26, 2015, nearly two years later.

### 2. For Whom The Statute Tolls

On March 13, 2013, Plaintiffs Marshall and Anderson filed an appeal of the union's withdrawal of the group grievance with International. (Compl. ¶ 28; Defs.' Mot. Ex. 7.) The appeal is signed by and names only Plaintiffs Marshall and Anderson. UAW Defendants argue that because the appeal process under the UAW Constitution requires a signature by each appellant, this appeal was filed on behalf of only the two named members who

11

signed it, Marshall and Anderson. Plaintiffs argue that it was an appeal on behalf of the group. (Defs.' Mot. 11-14; Pls.' Resp. 17.)

Plaintiffs further allege that "any and all applicable statutes of limitations were tolled while plaintiffs pursued internal remedies and/or were tolled because of the material misrepresentations made by union officials as to the union's willingness to grieve and/or appeal plaintiffs' issues, and as to plaintiffs' obligations to pursue internal remedies." (Compl. ¶ 40.) UAW Defendants argue that the limitation period was tolled only as to two Plaintiffs, Marshall and Anderson, not the other 91 Plaintiffs. (Defs.' Mot. 11-13.)

The Sixth Circuit in *Robinson v. Central Brass Manufacturing* considered the question as to when the statute of limitations is tolled while the employee pursues internal union appeals. *Robinson*, 987 F.2d 1235, 1240-44. The *Robinson* court noted, in addition to other numerous factors, that "in order for the statute of limitations to be tolled, the internal union appeal must be able to afford the claimant *some* relief from the defendant" and, on the other hand, the court must consider the difficulty in some cases for "an employee, even after the exercise of due diligence, to determine that the internal union remedies are completely futile." *Id.* at 1242 (emphasis in original). The court concluded that "whether to toll the limitations period is a question within the discretion of the district court." *Id.* Neither party argues that the limitations period should not be tolled for Plaintiffs who pursued the internal appeal. The issue then is which Plaintiffs filed the appeal?

Article 33 of the 2010 UAW Constitution (the "UAW Constitution") sets forth the procedures for appeals and section 4(a) provides that "[t]he appeal should be as specifically detailed as possible and must include an original physical signature, signed by the member(s). Electronic submissions and electronic signatures shall not be permitted."

12

(Constitution of the International Union (UAW), Adopted June 2010, Defs.' Mot. Ex. 9.)

Plaintiffs rely on *Dragomier v. International Union UAW*, for the premise that individual signatures are not required on a group appeal of a group grievance. *See Dragomier v. Int'l Union UAW*, 2012 WL 6738766 (N.D. Ohio Dec. 29, 2012) (addressing motions for summary judgment on threshold issues). Yet *Dragomier* has significant distinctions from the case at bar. The *Dragomier* court noted that the record was "replete with evidence that throughout the process," everyone, including the union and the International Executive Board ("IEB"), "believed that Dragomier was representing all 35 appellants." *Id.* at *7. The *Dragomier* plaintiffs also attested that all communications went through *Dragomier* and each plaintiff "contributed to the retention of the attorney they had hired." *Id.* at *8. Unlike *Dragomier*, the signatory Plaintiffs on this appeal, Marshall and Anderson, were not the same that had represented the group during the initial grievance process and in related correspondence; that individual was Plaintiff Young.[6]

Defendants rely on *VanRiper v. Local 14, UAW*, 2015 WL 45533 (N.D. Ohio Jan. 2, 2015), which the Court agrees is more like the case at bar. In *VanRiper*, the employee plaintiff Hanley had filed a group grievance, the "Hanley Grievance," which was denied at the first two steps of the grievance process, appealed by the UAW Local 14, and thereafter withdrawn. *Id.* at *2-3. Both Hanley and employee/plaintiff VanRiper "sought to appeal the

---

[6] The Court also considered UAW Defendants' argument that *Dragomier* dealt with a previous version of the UAW Constitution, "which did not include the explicit requirement for the individual physical signature, added to the 2010 UAW Constitution." (Defs.' Reply 2.) While that may be so, *Dragomier* does not indicate the version of the constitution on which it relies and the *Dragomier* court recognized that the Constitution required a signature, stating that "the second and third levels of appeal contain a signature requirement." *Dragomier*, 2012 WL 6738766, at *7. Other distinctions between *Dragomier* and the case at bar are more persuasive.

13

withdrawal of the Hanley Grievance . . . ." *Id.* at *3. Vanriper's appeal was denied and she

filed suit in federal court. *Id.* at *3.  The defendants argued in part that the other 53 plaintiffs

failed to exhaust their administrative remedies prior to filing. *Id.*  at *4. The *VanRiper* court

agreed, first pointing out that

> [I]t is undisputed that the CBA in this case sets forth a grievance procedure.
> Further, it is undisputed that internal union appeal remedies are available
> under Article 33 of the UAW's Constitution, which requires any appeal of a
> decision regarding interpretation of a CBA to go through the International
> President for final review and adjudication; in this case, President King. Of
> particular importance, § 4(a) of the UAW Constitution requires all appeals be
> signed by the union members seeking to pursue an appeal.

*Id.* at *4. "The parties stipulated that only VanRiper and Hanley appealed Defendants' joint

decision to withdraw the Hanley Grievance. Moreover, in violation of § 4(a) of the UAW's

Constitution, the record is clear that only VanRiper and Hanley signed appeals. These

facts, on their own, are enough to prove failure to exhaust."  *Id.* at *5 (citing *DeMott v. UAW

Int'l Union*, 2011 WL 824488 (E.D.Mich. Mar. 3, 2011) (Edmunds, J.) (finding that only two

of the plaintiffs had "sent a letter asking for an appeal with their signatures on it" despite

the signature requirement of Article 33, § 4(a) of the UAW Constitution)).

Plaintiffs argue that the union understood that the grievance was on behalf of the

group and signed by a single representative and never raised the issue of who was being

represented. (Pls.' Resp. 17.) However, the grievance process and the appeals process are

distinct. No one has challenged the grievance level group representation prior to the

appeal. The signature requirement at issue herein is set forth in the UAW Constitution

provisions governing the appeals process.

A finding that the instant appeal was on behalf of only those who were named and

signed is consistent with the Complaint, where Plaintiffs allege that "[o]n or about March

14

13, 2013, two other union-members, Shante Marshall and Jakeiya Anderson, wrote to the International UAW requesting an appeal of the union's decision to withdraw the grievance." (Compl. ¶ 28.) This is not unlike *VanRiper*, where the court noted that the parties had stipulated that "only VanRiper and Hanley appealed . . . ." *VanRiper*, 2015 WL 45533, at *5.[7]

A June 17, 2013 letter from the Administrative Assistant to the President acknowledged receipt of the appeal, and was addressed only to "Shante Marshall, Member" and "Jakeiya Anderson, Member." (Pls.' Resp. Aff. A, Ex. E.) The Court also notes that the International decision identifies them at the top as "Shante Marshall, et al" and "Jakeiya Anderson, et al", which is ambiguous and may indicate either that International believed that Marshall and Anderson were acting on behalf of others, or International was simply referencing the fact that two appellants are subject to the decision. This does not show that there were appellants other than Marshall and Anderson, nor who those appellants may have been.

Other than by referring to the "group" grievance and attaching the grievance, which had originally been titled and identified as a "group" grievance, the appeal itself and the Complaint allegations do not show that the appeal was signed by anyone other than Plaintiffs Marshall and Anderson. Consistent with *VanRiper*, the Court finds that the Complaint and documents show that the only two Plaintiffs who brought the appeal pursuant to the UAW Constitution requirements were those who signed it: Plaintiffs

---

[7]The court did not quote the exact language by which the parties "stipulated," which is worth noting because the plaintiffs had clearly argued that the "VanRiper and Hanley appeals were intended to apply to the group as a whole." *Id.* at *4.

Marshall and Anderson. The statute was tolled as to Plaintiffs Marshall and Anderson. The remaining Plaintiffs failed to exhaust their remedies, their claims are barred by the six month statute of limitations and are therefore dismissed.

### b. Failure to Exhaust Contractual Grievance Remedies

With respect to Plaintiffs other than Marshall and Anderson, "a failure to exhaust can be excused if 'resort to the procedures is demonstrably futile.'" *VanRiper*, 2015 WL 45533, at *5 (citing *Monroe v. Int'l Union, UAW*, 723 F.2d 22, 25 (6th Cir. 1983)); *see also Miller v. Chrysler Corp.*, 748 F.2d 323 (6th Cir. 1984). "The courts have generally insisted upon a 'clear and positive showing of futility' before excusing a failure to exhaust . . . ." *Miller*, 748 F.2d at 326 (citation omitted). Plaintiffs make general and conclusory allegations in the Complaint that they are excused from exhausting internal remedies due to factors including futility, hostility , concealed information and substantial compliance. They fail to develop these argument in their Complaint or Response.[8] (Compl. ¶ 40.) To the extent Plaintiffs made more specific allegations related to the length of time which it took UAW Defendants to respond to their initial grievance and the later appeal, the Court's decision herein considered the facts plead by Plaintiffs in the light most favorable to them and found that

---

[8] Failure to exhaust may be excused for the following factors:

> [A]t least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedure would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust. *Clayton v. Int'l Union, UAW*, 451 U.S. 679, 689 (1981).

the date on which their action accrued was January 14, 2013, a date which post-dates an admittedly lengthy period of time in which Young was told that the grievance was "dead" and submitted inquiries about the status of the grievance. It is a date certain on which Plaintiffs were notified in writing that the grievance had been withdrawn. Plaintiffs' pleadings do not allow the Court to reasonably infer facts to show that the failure to exhaust should be excused.

### B.  The Complaint Does Not Specifically Identify The Terms Of The CBA That Were Allegedly Breached

Because the Court determines that the statute of limitations was tolled as to the two Plaintiffs who signed the appeal, the remainder of UAW Defendants' Motion To Dismiss must be considered. Plaintiffs' Complaint alleges that GM violated the CBAs and that UAW Defendants violated their duty of fair representation. Plaintiffs allege that the UAW Defendants knew about alleged contractual violations by Defendant GM and "failed to investigate said violations and improperly withdrew plaintiffs' grievance and failed to support plaintiffs in their attempt to appeal the union's decision to withdraw the grievance." (Compl. ¶ 46.)

As set forth above, to prevail on a hybrid § 301 action, Plaintiffs must prove that Defendant GM breached the CBAs and that the UAW Defendants breached their duty of fair representation. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990); *Del Costello*, 462 U.S. at 164-65. No liability attaches to either defendant (union or employer) unless both prongs of the hybrid § 301 claim are established. *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999).

The union is afforded a "wide range of reasonableness . . .  in serving the unit it

17

represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). "[A] union does not breach its duty of fair representation by rejecting an employee's interpretation of the collective bargaining agreement unless the union's interpretation is itself arbitrary or unreasonable." *Bache v. Am. Telephone and Telegraph*, 840 F.2d 283, 291 (5th Cir. 1988). Therefore, the Court considers whether Plaintiffs have stated a valid claim for violation of the CBAs and related agreements. (Compl. 46.)  UAW Defendants argue that although Plaintiffs advance multiple grounds for their § 301 claims, they fail to identify a violation of any specific provision. The Court agrees.

"It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Harris v. American Postal Workers Union*, 198 F.3d 245, 1999 WL 993882, at *4 (6th  Cir. Oct. 19, 1999); *see also Northhampton Restaurant Group, Inc. v. FirstMerit Bank, N.A.*, 492 Fed. Appx. 518, 522 (6th Cir. 2012).   "Without the introduction of the alleged terms, neither the district court nor the jury can find for Plaintiff." *Harris*, 1999 WL 993882, at *4.

The merits of Plaintiffs' § 301 claims are belied by their Response brief, in which the analysis of the "Substantive Contractual Arguments" merely states that UAW Defendants' arguments are "rebutted in the Facts section above" and again sets forth their theory of the case. (Pls.' Resp. 22.) As set forth in the analysis below, Plaintiffs do not identify specific contract provisions that support their assertions of how Defendants breached the CBA and other agreements. In some instances, Plaintiffs merely argue that the lack of contractual

18

language to support their interpretation precludes dismissing their claims.[9] Those arguments ignore the 12(b)(6) standard, whereby Plaintiffs' Complaint must "state a claim for relief that is plausible on its face." *Estate of Barney*, 714 F.3d at 924. Plausibility is not a "probability requirement," yet it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Plaintiffs' claims do not meet the standard. "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

### 1. Whether Employees Who Accepted A Buy Down Were Supposed To Return To Tier I Wages After The Buy Down

One of Plaintiffs' primary arguments is that for those employees who accepted the "buy down option" at Delphi pursuant to the 2007 RA, the buy down was only intended to last the three years that the buy down payments were given, and after those three years, Plaintiffs' wages (then at GM) should have been raised to Tier I level wages.

Despite Plaintiffs' general reference to a buy down program having occurred at Delphi

---

[9] For example, Plaintiffs' argument that "[s]ince the UAW cannot point to any specific contractual language which says that the buy-down constituted a permanent forfeiture of plaintiffs' Delphi and GM seniority and wage structure (and since defendants have the burden of proof in this motion), this Court should not dismiss these plaintiffs' claims on a Motion to Dismiss since the contractual language is ambiguous and subject to a number of possible interpretations." (Pls.' Resp. 10.) Simply calling something ambiguous does necessarily not make it so.

in 2006, Plaintiffs provide no supporting evidence or documentation of this agreement.[10]

(Compl. ¶ 12.) The 2007 RA, however, included several options, including a buy down

option. (Defs.' Mot. Ex 2.) Section C, "Workforce Transition", sub-section 5 of the 2007 RA

provided three categories of "Transformation Program Options": Retirement Incentives

(traditional employees); Buy Out (traditional employees); and Buy Down (traditional

employees). The Buy Down option provides that:

> 1) Effective October 1, 2007 all Traditional Employees, both production and
> skilled trades, other than pre-retirement program participants, will become
> Supplemental Employees and will be covered by all provisions of the
> Supplemental Agreement.
>
> 2) Buy Down payments will be made to Traditional production employees as
> described below and will not exceed $105,000.
>
>> a) Traditional production employees on active status (including Protected
>> Status, but excluding pre-retirement program participants), and Traditional
>> production employees on temporary layoff as of October 1, 2007 will be
>> eligible for the Buy Down payments.
>>
>> b) The $105,000 Buy Down payment will be paid out in three (3) equal
>> installments of $35,000, less applicable withholding, in the first pay ending
>> after October 1, 2007, October 1, 2008, and October 1, 2009 provided the
>> employee is on active status, receiving holiday pay, paid vacation, jury
>> duty, military leave, or temporary layoff status on each of those three (3)
>> dates. The October 1, 2008 and October 1, 2009 payments will be
>> prorated based on the number of pay periods worked and the rate of
>> compensation in the preceding 52-week period. Treatment of employees
>> on disability or Workers' Compensation leave is in accordance with (d) and
>> (e), below.
>> . . . .

(2007 RA, Defs.' Mot. Ex. 2.)

   Although this is just an excerpt of the Buy Down provisions, Defendants correctly point

---

[10] Plaintiffs do not include a 2006 agreement or other document in their recitation of
agreements in the Complaint or their response. (Compl. ¶¶ 8, 12, 37; Pls.' Resp. 7.)

20

out that the agreement does not contain language that restores these employees to the higher Tier I wages at the end of receiving the three annual payments.[11] The 2007 RA provides that these employees "will become Supplemental Employees" covered by the "Supplemental Agreement." Plaintiffs identified no specific provision that would restore buy down employees to Tier I status at Delphi, had they not been transferred to GM.[12] Plaintiffs interpretation of the agreement is not supported by the contract language therein and Plaintiffs have identified no support for this argument elsewhere. Plaintiffs merely allege that "[a]t the end of the buy-down period, the employees' wages were supposed to go back up to their former levels." (Compl. ¶ 12.) Plaintiffs themselves refer to this as an "inference." (Pls.' Resp. 3.) Plaintiff argues that it is this silence in the contract "as to what happens at the end of the three-year buy-down period" that makes this issue "one of interpretation" and "beyond the scope of a Motion to Dismiss." (Pls.' Resp. 8-9.) Yet this ignores the requirement that Plaintiffs must identify and present the actual contract terms that were allegedly breached.

Plaintiffs' counsel argued at the hearing that the 2007 RA provided that the Delphi buy

---

[11] Further, where Plaintiffs allow that the difference in wages is approximately $8.00 per hour, it simply does not make sense that a financially struggling company would institute such a buy down measure for a period of only three years, the same three years in which Plaintiffs received lump sum payments in lieu of higher wages, then return the employees to the previous Tier I wages. (Pls.' Compl. ¶ 12.) According to Plaintiffs' argument, Delphi would be pay each employee approximately $35,000 per year for the privilege of a temporary wage reduction, before returning the same employees to the prior higher wage.

[12] As UAW Defendants point out, a 2004 supplemental agreement between Delphi and the UAW sets forth a two-tier wage structure, yet, consistent with the 2007 RA, there is no provision that provides for future reinstatement to the higher Tier I wages. (Defs.' Mot. Ex. 2 at 12-13; Compl. ¶¶ 12, 37 "among other agreements and MOUs".)

down employees would receive credit for time spent at Delphi and would not be treated as new hires under the following provision:

> In determining the wages and benefits for Traditional Employees who Buy Down to Supplemental Employee status, such employees will be given credit for time spent as a Delphi Traditional Employee at traditional wages and benefits (i.e., will not be treated as new hires for purposed of applying Supplemental Agreement wage and benefit schedules)."

(2007 RA at C(5)(c)(3), Pls.' Resp. Ex. 2 at 10-11.) This provision is neither ambiguous nor does it establish seniority for purposes beyond the purpose set forth within the provision, that of determining wages and benefit levels under the Supplemental Agreement. The Supplemental Agreement to which it refers provides a range of wages based on the number of weeks from the date of hire. Although the employees are buying down to a lower tier of wages, there is a progressive wage schedule within that lower tier, for example, a Group B employee (which includes assembly) with 0-26 weeks from the date of hire earns a "starting rate" of $14.00 per hour, while an employee with 157-182 weeks from date of hire earns the "production rate" of $16.50 per hour (with incremental increases for ranges of seniority between these two extremes). (UAW-Delphi Supplemental Agreement Art. 1, Att. A, Pls.' Resp. Ex. 1.)

The buy down provisions are not ambiguous and Plaintiffs identified no contract language that requires the Delphi employees to have been returned to Tier I wages after accepting the buy down.

### 2.   Whether Plaintiffs' Were Entitled To Retroactive GM Seniority

Plaintiffs in their Complaint allege that

Those plaintiffs who began working for Delphi in 2006 and who had been paid

22

at Tier II levels at Delphi should have been making Tier I wages once they were transferred to GM in 2009 because their seniority dates with Delphi were 2006 and those seniority dates pre-dated the concept of two-tiered wage structures that GM initiated in October, 2007. . . . .

(Compl. ¶ 14.) Plaintiffs then allege that "[i]n February, 2009, GM and the UAW signed a Memorandum of Understanding (MOU) giving all Delphi Flint East employees who transferred to GM in January, 2009, a retroactive March 17, 2008 GM Corporate Seniority date, which also should have triggered the higher wage rate." (Compl. ¶ 15.) The February 12, 2009 Memorandum Of Understanding Establishment Of GM Seniority Date At The Delphi East Location (2009 MOU) provided that, effective January 5, 2009, "those employees working at the Delphi Flint East location became employees of General Motors and will be assigned March 17, 2008 as their General Motors Corporate Seniority Date." (Pls.' Resp. Ex. 10.)

The Complaint does not identify specific contract provisions to support Plaintiffs' theory that the 80 Plaintiffs hired at Delphi in 2006 have 2006 seniority dates, were full-time Delphi employees with Delphi seniority pre-dating the 2007 RA, and therefore, should not have been considered entry level employees at GM when they were officially hired at GM in January 2009. Plaintiffs go on to argue that this 2006 seniority date "pre-dates the switchover at GM from one pay rate for seniority employees to the two-tier system implemented in fall of 2007 pursuant to the UAW-GM National Agreement holds sway; plaintiffs' seniority as Delphi employees should have transferred with them to GM." (Pls.' Resp. 12-13.) Plaintiffs admit that "there is not specific contractual language that says these employees are grandfathered in," and relies instead on "an absence of language that says they are not, . . . ." (Pls.' Resp. 12.)

23

Plaintiffs pleadings fail on two counts. First, the language in the 2009 MOU is not ambiguous in a assigning a new GM seniority date and Plaintiff identifies no contract provision to the contrary. The 2009 MOU identifies few exceptions to the March 17, 2008 GM corporate seniority date, none of which are shown to apply here. For example, "[e]mployees who are covered by the UAW-GM-Delphi Flowback Agreement, who were hired on of before October 18, 1999, will retain their Delphi Corporate Seniority Date as their General Motors Corporate Seniority Date." (Pls.' Resp. Ex. 10.) There is no allegation that this exception applies to the remaining Plaintiffs Marshall and Anderson. The 2009 MOU also provides that the employee's "Corporate Seniority Date established at Delphi" will apply when needed for "purposes of Plant Seniority tie breaker." (Pls.' Resp. Ex. 10.) The 2009 MOU is not ambiguous in setting forth the applicable corporate seniority dates and specifying those limited circumstances when a Delphi seniority date will still be used.

Second, as Defendants correctly point out, the assigned retroactive GM seniority date of March 17, 2008, post-dates the effective date of GM's new two-tier wage system, effective October 15, 2007. (Defs.' Mot. Ex. 10.) Plaintiffs identify no contractual basis for finding that this seniority date would have triggered GM's higher Tier I wage.

Despite Plaintiffs' general references to agreements and memorandums of understanding dating back to 1999, their allegations remain vague and conclusory at best, for example, that "[t]he grievance further stated that notwithstanding the language of the CBAs and MOUs cited above, when GM hired Delphi Flint East employees – including plaintiffs – on January 5, 2009, the employees were hired at Tier II (lower) wages when they should have been hired at Tier I wages." (Compl. 21.) Plaintiffs' claims lack the support of specific relevant contractual provisions that contain language that supports Plaintiffs'

24

inferences and conclusions. Plaintiffs have not plead sufficient facts to state a claim for relief based on a breach of the CBA or related agreements.

### C.  The Complaint Does Not Allege An Independent Duty Of Fair Representation Claim

Finally, Plaintiffs' Count II alleges a violation of 29 U.S.C. § 159, in conjunction with 28 U.S.C. § 1337, noting that it is independent of the hybrid § 301 claim in Count I. The UAW Defendants argue that Plaintiffs did not allege an independent breach of duty of fair representation claim. In response, Plaintiffs argue that they "are clearly making allegations of union misconduct independent of whether GM breached any agreements" and cite to their Complaint at paragraphs 33, 34, 36 and 42, to show allegations of "the union's misrepresentations to plaintiffs, the union's failure to properly investigate plaintiffs' claims, the union's unreasonable delays in processing plaintiffs' grievance and/or appeal, as well as the union's failure to follow through on the initial grievance, . . ." (Pls.' Resp. 24-25.)

As set forth above, to prevail under a hybrid § 301 claim, the employee must show both that the employer breached the collective bargaining agreement and that the "union breached its duty of fair representation during the grievance process." *Robinson*, 987 F.2d at 1239. These two claims are interdependent, "if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555 (6th Cir. 1990). "In the context of a hybrid 301 action, absent a finding that an erroneous arbitral decision has been reached, the inquiry into the union's failure to comply with its duty of fair representation becomes immaterial, and is not justiciable." *White*, 899 F.2d at 560.  However, "Section 9(a) [29 U.S.C. § 159(a)], in

25

conjunction with 28 U.S.C. § 1337, creates a jurisdictional basis for actions for breach of the duty of fair representation independent of Section 301." *Pratt v. UAW, Local 1435*, 939 F.2d 385, 388 (6th Cir. 1991) (citing *Breininger v. Sheet Metal Workers Int'l*, 493 U.S. 67, 83-84 (1989) ("[f]ederal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers.")). The Sixth Circuit has noted that

> In none of the cases in which this and other courts have asserted jurisdiction under 28 U.S.C. § 1337 over separate causes of action alleging breach of a union's duty of fair representation, however, has there been a colorable allegation that a collective bargaining agreement had been breached. Rather, in all of those cases, the principal issue joined by the controversy arose from circumstances rooted in the relationship existing between a union member and his union, rather than in the relationship existing between a union member, his union, and his employer as forged through a collective bargaining agreement.

*White*, 899 F.2d at 560-61.

UAW Defendants rely on *Pratt v. UAW* to argue that Plaintiffs cannot merely cast "their duty of fair representation claims as independent causes of action in what are, in substance, hybrid 301 claims." *Pratt*, 939 F.2d at 389. *Pratt* dealt with an action against the union under the National Labor Relations Act [NLRA], independent of a § 301 claim. *See id.* at 388. Unlike the instant case, the *Pratt* plaintiff did not allege a breach of the CBA by his employer, never named the employer as a defendant and had not filed a grievance under the CBA. *Id.* at 389. Although his action involved "a dispute over the termination of his employment at Chrysler," the court noted that the "complaint alleges breaches of duty on the part of the union *independent* of the collective bargaining agreement" and "Pratt's complaint does not allege facts to support a 'colorable claim' under the collective bargaining agreement." *Id.* at 389. The court found that in these circumstances, the plaintiff "need not

26

state a claim under Section 301 to state a claim under Section 9(a). In other words, the district court was in error in finding that Pratt's complaint did not state a claim under Section 9(a)." *Id.* at 390.

In *White v. Anchor Motor Freight*, the Court of Appeals held that "appellant's complaint, although alleging jurisdiction under both section 301 of the LMRA and 28 U.S.C. § 1337, stated a quintessential hybrid 301 claim." *White,* 899 F.2d at 561-62. Like *White,* Plaintiffs in the instant case brought their claims against the employer and the union. They had previously filed a grievance under the CBA and the complaint alleges breaches of the CBA by the employer and purports to allege facts in support of such a breach. Despite the possible delays by both parties during the grievance process and possible delays by UAW Defendants during the appeal process, the Court finds that Plaintiffs have not presented any allegations of breach of fair representation that are independent of their section 301 claims.

> To prove a breach of the duty of fair representation, [Plaintiffs] must demonstrate that the Union's actions or omissions in the grievance process were arbitrary, discriminatory, or in bad faith.
>
> . . . [A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational. Moreover, ordinary mistakes, errors or flaws in judgment also will not suffice.... In essence then, to prevail, a plaintiff has the difficult task of showing that the union's actions were wholly irrational.

*Plunkett v. Smurfit-Stone Container Corp.*, 247 Fed. Appx. 604, 607-08 (6th Cir. 2007) (internal citations and quotations omitted). The Court finds that the facts plead by Plaintiffs do not support a claim that UAW Defendants acted outside a "wide range of

reasonableness."[13] Further, the facts and issues that Plaintiffs plead arose from the circumstances of the relationship between the union member, the union *and* the employer. Plaintiffs have not plead an independent claim for breach of the duty of fair representation.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss (Dkt. # 16) and DENIES Plaintiffs' request seeking leave to amend.  UAW Defendants are DISMISSED.  Plaintiffs Marshall and Anderson remain and all other Plaintiffs are DISMISSED.


SO ORDERED.


S/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 1, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 1, 2015, by electronic and/or ordinary mail.

S/Carol J. Bethel
Case Manager

---

[13] Plaintiffs allege "material misrepresentations" only generally, a legal conclusion couched as fact. (Compl. 42.) Despite Plaintiffs' allegation that Defendants misled them as to the status of the grievance, Plaintiffs themselves admit that they were notified verbally that the grievance was "dead," and on "hold" as early as 2011. (Compl. 23, 24. 36.) With respect to their argument that the appeal should have gone to the public review board ("PRB"), the appeal was resolved pursuant to UAW Constitution Art. 33 2(b) which does not provide for further appeal in this instance. (UAW Constitution article 33, section 2(b), Defs.' Mot. Exs. 8, 9.)